# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

WELLS FARGO BUSINESS CREDIT
INC.,

     Plaintiff,

        v.

DOVEBID VALUATION SERVICES,
INC.,

     Defendant.

No. 03 C 7583
Judge James B. Zagel

## MEMORANDUM OPINION AND ORDER

In the summary judgment motion, Defendant Dovebid Valuation Services ("Dovebid") seeks to knock out two of the legal theories on which Wells Fargo Business Credit ("WFBC") seeks to impose liability and, if it succeeds, to limit the extent of claimed damages. The material facts are undisputed, but the parties interpret them differently.

WFBC is a commercial lender. Dovebid appraises the value of assets.[1]

In 2000, Stelax made steel at a plant in South Wales, U.K. Stelax sought an asset-based loan from Bank of America ("BOA"). Such loans are based, in part, on loan-to-value ratios deemed satisfactory. BOA contacted Dovebid to appraise Stelax's assets as part of BOA's due diligence. Dovebid dealt with Stelax, which entered an agreement with Dovebid to perform the appraisal that BOA wanted.

Dovebid went to Wales, visited the Stelax plant, and, on February 29, 2000, opined that the orderly liquidation value of assets was about $8.5 million and the forced liquidation value

_____

[1] The valuation at issue here was performed by a company that Dovebid later purchased. I disregard this fact in order to simplify the narrative.

was about $7 million.  Dovebid sent the appraisal to Stelax.  The forced liquidation appraisal contained the customary proviso that valuations were based on present-day economic trends within 90 days of the appraisal.[2]  There was also the customary disclaimer of "your guarantee of actual sale results" since its opinion did "not apply to any past or future dates."  The report of appraisal also noted that it "has been intended for use by the purchaser . . . [o]thers intending to use this report must do so with the understanding that no warranty or guarantee have been purchased by the owner of the report [Stelax] through the fees paid to [Dovebid]."

BOA agreed to extend credit of $5.75 million to Stelax; $750,000 in a revolving line of credit and $5 million in a term loan.  BOA's securities were the appraised assets plus the real.  BOA's loan agreement also provided that $1.8 million of the loan would be held in an interest-bearing escrow account in BOA's name.  The first year's payments on the loan would be paid from this account .[3]

The interest rate was prime +2.25%.  If there were a default, the rate would be prime +4.25%.  Stelax had to pay fees for eight other services, some of which might be conditional.  Stelax agreed to pay BOA's legal fees for any action predicated on a breach of the loan agreement.

---

[2]  The orderly liquidation value was the "estimated gross dollar amount which the Assets could typically realize [at an] orderly liquidation sale usually within 12 months . . . of the date of the 2000 Appraisal."  The assets were not sold within the year.

[3]  This, it seems to me, substantially mooted any long-term reliance BOA might have on the Dovebid appraisal in forced liquidation sales since it was valid only for a much shorter time.  It might also have mooted reliance upon the orderly liquidation valuation since that too only lasted for about a year.  I say "substantially" because there are usually actions by debtors apart from non-payment that will breach a loan agreement.

Dovebid did not sign the loan agreement or a guaranty of Stelax's obligations. The loan was made at the end of June, 2000.

WFBC reviewed the portfolio and bought several loans for $374 million, including the Stelax loan for about $4.7 million. WFBC did its review of the BOA portfolio over a period of three weeks.

Only one WFBC employee, Marty McKinley, reviewed the Stelax loan files. He has no memory of ever reviewing the 2000 appraisal. Nor did any WFBC employee recollect providing the 2000 appraisal to McKinley. No one from WFBC recalls reading the portfolio. None of this is in dispute. WFBC relies on its business practices to claim that it would ordinarily review an appraisal and therefore did read and rely upon it.

I suppose that a more elaborate showing of WFBC practices and the invariability of compliance with those practices over a significant period of time might serve as a basis for admission of WFBC's contention. That is not what is presented here. There is no corroboration that the appraisal was relied upon. In McKinley's Due Diligence Report, there is a reference to appraised value—the handwritten number "7.398"—but the reference is incorrect. The forced liquidation figure was "$7,039,800." To be sure, this is some evidence that, at some time and from some source, a number like the appraisal number was found by McKinley at BOA. But it is difficult to reconcile the error in the number with the claimed practice of careful examination of the appraisal as a predicate to reasonable reliance on the appraisal.

Dovebid argues that "the McGrath Affidavit" does not belong in the case. McGrath was deposed twice and some of his affidavit does clarify the meaning of some things said at the depositions. To the extent that one can interpret McGrath as stating that he has a clear memory

of seeing or relying on the appraisal, it is an improper attempt to contradict the substance of his sworn deposition. Read fairly, McGrath testified that the appraisal "would" have been considered; this based on its routine business practices. It is a reasonable approach, but the foundation for it is not laid.

To the extent that WFBC asserts the proposition that it explicitly read and relied upon the appraisal, WFBC's statements of facts Nos. 3, 4, 5, 7, 9, 10, 12, and 18 are stricken.

WFBC did not contact Dovebid to discuss the appraisal. WFBC defends this on the grounds that its ordinary practice would not call for such a contact. (There is a dispute over this claim because an expert in banking practices reports that this is untrue.) I assume, as I must at this state, that WFBC's assertion is true.

When WFBC bought the loans, it assigned its right, title and interest in the Stelax Loan and Security Agreement to WFBC. It also assigned the loan documents to BOA, though without specific mention of the appraisal. BOA did specifically provide that it makes no warranty of accuracy of third-party reports [which specifically references appraisals].

BOA transferred the escrow reserve (now $1.56 million) to WFBC. WFBC used it to pay principal and interest owed by Stelax. After that, Stelax failed to make a payment.

On May 15, 2001, WFBC notified Stelax, by letter, that Telex was in default.

In mid-November, Stelax and WFBC entered a Forbearance Agreement wherein Stelax conceded its default of about $3.64 million and agreed to pay the default interest rate retroactive to December 31, 2000.

Dovebid played no role in any part of these events until mid-April 2001 when WFBC asked Dovebid to appraise the Stelax equipment. WFBC sent an engagement letter to Dovebid,

which Dovebid never signed. Dovebid representatives did visit the Stelax facility and physically inspect the equipment around the end of May, 2001. Dovebid did the appraisal and in July sent it to WFBC, which never paid for it.[4] The appraised forced liquidation value was $2.86 million.

On March 7, 2002, Stelax went into receivership in the U.K. The net value realized from disposition of the equipment was paid on the loan.

Dovebid argues that there is no justification for a contract claim when there was never a contract between Dovebid and BOA to whose interests WFBC could succeed. WFBC does not resist this argument. It says that BOA and, therefore, WFBC is a third-party beneficiary of the contract between Stelax and Dovebid. There is no reported decision cited that supports the WFBC position, nor can I find one. Appraisers, in these circumstances, serve the lender, and a referral by a bank to a specific appraiser is simply a service to the lender by naming an appraiser that the lender deems to be competent.

The law does not much favor third-party beneficiary claims. *See F.H. Paschen/S.N. Nielsen, Inc. v. Burnham Station, L.L.C.*, 865 N.E.2d 228 (Ill. App. 1 Dist., 2007). Usually, a person not named as a beneficiary is allowed to claim under the contract if, and only if, the person is intended, alone or among others, to derive a benefit from performance of the contract. This must be clear at the time the contract is formed.

---

[4] WFBC argues that it did pay, at least in the sense that it offset the fee against, what it asserts, but has not proven, are its damages due from Dovebid. There was no offset here. At best, WFBC refused to pay an amount it concedes is due until it gets the money from Dovebid. By contrast, Dovebid does not concede owing this money to WFBC. Since Dovebid does not press for payment, I leave to another day the question of whether WFBC could have been right to do what it did.

BOA was itself not an intended beneficiary of the contract. The beneficiary was the borrower. WFBC, standing alone, cannot claim under the contract. It came into the transaction long after performance of the contract was complete. BOA cannot sue as a beneficiary. If it benefitted, it would benefit from the loan, not the contract.

The context of the law governing liability in these sorts of transactions does not favor contract claims. It permits another remedy, that of a suit for negligent misrepresentation, a tort claim. *Sampen v. Dabrowski,* 584 N.E.2d 493 (Ill. App. Ct. 1991); *Duhl v. Nash Realty, Inc.*, 429 N.E.2d 1267 (Ill. App. Ct. 1981).[5]

I find, too, that damages cannot be had on any grounds based on the 2001 appraisal. The credit that was extended in this case was extended months prior to the 2001 appraisal. There were transactions subsequent to that appraisal, but these were not extensions of credit, they were efforts to collect.

Lastly, the damages claimed on the basis of negligent misrepresentation are limited to out-of-pocket damages. It is my opinion that Restatement (Second) of Torts § 552B(2) is or would be prevailing law in this case. On what is pled here, fraud damages are unavailable. What is available is about $2.2 million.[6]

---

[5] The nature of the transaction in this case offers little incentive to declare BOA an incidental beneficiary. BOA is a sophisticated lender. It could have insisted that Dovebid contract with it or insist that Stelax pay Dovebid to give a warranty to BOA. Its choice to refrain from such options is its decision, no one else's. It eschewed contract remedies because it knew it had a negligent misrepresentation remedy (at no additional cost to itself or its borrower).

[6] As a practical matter, this is the only claim WFBC is likely to win even if it had enough evidence to show contract reliance. It would have to persuade the jury demanded by Dovebid that it was damaged despite its invariably rigorous processing of its loan portfolio. It will be a few years before an American jury would be likely to accept the premise of careful lending. Even under negligent misrepresentation, it is a tough case to win, but WFBC is entitled to try.

Dovebid's motion for summary judgment is granted.

ENTER:

James B. Zagel
United States District Judge

DATE: September 18, 2008